IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 12-CR-30090-MJR |
| | ) | |
| ANTHONY MONTEZ TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

REAGAN, District Judge:

**A.  Introduction and Procedural Overview**

Via indictment, the United States of America ("the Government") charged Anthony Montez Taylor with one count of possessing with intent to distribute between 28 and 280 grams of crack cocaine, in violation of 21 U.S.C. 841(a)(1). Taylor pled not guilty and was set for jury trial before the undersigned Judge. Prior to the trial date, Taylor moved to continue trial and separately sought additional time to file pretrial motions. The Court granted both motions and continued trial to October 1, 2012.

Taylor filed a motion to suppress, which the parties briefed and the undersigned Judge set for hearing. The evidentiary hearing began on September 14, 2012 and continued on September 26, 2012. At the conclusion of the hearing, the Court took the suppression motion under advisement, allowed the parties to file supplemental briefs through October 9, 2012, and continued trial to October 29, 2012. For the reasons delineated below, the Court denies Defendant's motion.

B.  **Analysis**

→  **SUMMARY OF FACTS AND TESTIMONY**

On March 5, 2012, Justin Straub, a part-time Fairmont City (Illinois) Police Officer, was on duty as a patrolman, conducting routine weekly "business checks" of local businesses. Business checks are performed to ascertain if anyone at the motel has an outstanding warrant and to guard against prostitution and drug activity. This task took Straub to the First Western Inn on Collinsville Road around 7:00 pm on March 5th, where he examined the registration cards (provided by First Western's manager) for all guests staying at the motel. Straub ran the names through the computer in his patrol car. During this process, Straub learned that one guest, Anthony Montez Taylor, had an extensive criminal history, including a conviction for armed robbery. Mr. Taylor was registered in Room 221 of the motel.

Officer Straub waited for a second Fairmont Police Officer, Shaun Benyr, to arrive at the First Western Inn.[1] Benyr arrived around 8:10 pm, and the two officers began to walk through the motel's hallways, the majority of which were exterior. While walking the corridors on the second floor as they approached Room 221, Officer Benyr detected a strong odor of burnt cannabis, a smell he recognized from his training and law enforcement experience.

---

[1] Officer Straub had been employed by the Fairmont City Police Department for roughly one year prior to the March 5, 2012 incident in question. Officer Benyr had worked there about eight and a half years at that point.

Benyr turned to Straub and asked if he smelled the odor too. Straub said yes. The officers decided to conduct a "knock and talk."[2] Straub knocked on the door of Room 221. A male voice from inside asked "Who is it?" Straub identified himself as a Fairmont City Police Officer. The officers heard movement or shuffling in the room. A few seconds later Anthony Taylor opened the door. The officers remained in the exterior hallway while this exchange followed, with Mr. Taylor standing in the doorway (or for most of what followed) just *outside* the doorway to his room.

Taylor asked what the officers were doing. Straub explained they were conducting a business check of the property and could smell burned marijuana coming from the room. Straub asked if Taylor had cannabis or had been smoking it in the room. Taylor said no. Witness accounts differ on precisely what was said next and the sequence in which the statements were made. All witnesses agree that a woman (later identified as Brittany Lavington) came from the room to the door. Straub testified that this occurred after Straub asked Taylor whether anyone else was in the room with him, and Taylor said yes, his girlfriend was.

Lavington, who had just gotten dressed, walked out the door of the room into the hallway but did not have her jacket on yet and had left her keycard on the dresser. At some point shortly thereafter, Lavington went back in the room, retrieved her jacket,

---

[2] A "knock and talk" has been defined as a "consensual, information-gathering encounter," typically conducted without a warrant. **United States v. Lewis, 608 F.3d 996, 997 (7th Cir. 2010).** This technique is often used by law enforcement to investigate and/or to seek consent to search. *See also United States v. Johnson,* **170 F.3d 708, 720 (7th Cir. 1999)(stressing that police officers "must recognize the inherent limits in this more informal way of proceeding").**

joined the others outside Room 221, handed the officers a green glass pipe (of a type frequently used to smoke marijuana) and declared that it was all that was "illegal" in the room. Brittany Lavington and Byron Blackwell (a motel guest in Room 218 who overheard pieces of the conversation and observed parts of the encounter)[3] testified to additional statements before the pipe was produced, including: (a) Lavington stated that she was a nurse and did not use marijuana, and (b) Taylor or Lavington suggested that perhaps the officers had the "wrong room" as the source of the marijuana smell.[4]

Significantly to this Court's analysis, Lavington readily admitted that she went into the room, retrieved the green glass pipe, and gave it to the officers outside the door of Room 221. Furthermore, the record establishes that shortly after receiving the green pipe from Lavington, Straub asked if there was any more marijuana in the room, and Anthony Taylor stated that "it was all smoked up." During her testimony at the suppression hearing, Lavington further admitted that she *had* been smoking "weed" that day at the motel, in fact she had been smoking just prior to the knock on the door.

According to Officer Straub, Taylor said the green pipe was his. Straub asked if he could search the room to see if there was anything else there – drugs or drug paraphernalia. Taylor refused: "Nah, there's nothing else in there, and I'm a citizen."

---

[3] Blackwell knew Anthony Taylor slightly. Taylor frequented the package liquor store where Blackwell worked. Taylor and Blackwell were not close friends; they were casual acquaintances.

[4] It is unclear whether the pipe was Taylor's or Lavington's, but that detail is not significant here. Lavington testified that she (not Taylor) had been smoking marijuana that day. But Taylor told the officers that the pot "was all smoked up" and that the pipe was his.

Undeterred, the officers persisted in requesting consent to search the room. Taylor continued to refuse entry into the room.

Ultimately, Benyr explained that Taylor could withhold his consent to search the room, but – based on the smell, the admission of smoking marijuana, and the presentation of the paraphernalia (glass pipe) – the room would be secured and Benyr would apply for a search warrant. According to both officers, Taylor then replied, "You don't have to do all that, you can go ahead and look but there ain't anything in here." Straub testified that Taylor was standing with Lavington at this point. Lavington maintains that she never heard Taylor say this or otherwise consent to a room search.

According to Benyr, the officers suggested that Taylor and Lavington "take a step back" away from the doorway, further into the exterior hall outside Room 221. According to Officer Straub, Taylor voluntarily walked out of the room once he consented. The record is clear that neither Taylor nor Lavington was personally searched, neither was arrested, and neither was advised of Miranda rights at this time.

Taylor and Lavington stood in the hallway outside Room 221 by a trash can at the top of the staircase with Officer Benyr while Officer Straub searched the room. Both officers testified that although Taylor and Lavington were not arrested at this point, they were detained (i.e., they were *not* free to leave).

One key point in the testimony merits mention here. Roughly 15 minutes after the officers had been talking to Taylor outside Room 221 (and prior to the search), Lavington walked to the gas station next to the motel and purchased cigarettes. Lavington testified that she never consented to the search, that she never heard Taylor

consent to the search, and that she just walked away from the motel and went to buy cigarettes before Officer Straub searched the room. Although Officer Straub did not recall Lavington ever leaving (which could have occurred while Straub was searching Room 221 and Benyr was focused on Taylor), Lavington's testimony that she left the motel is buttressed by an eyewitness (one who had no reason to lie for Lavington).

Byron Blackwell, in a state of panic because he had been "smoking reefer" in Room 218, heard the officers talk about smelling marijuana and feared they were headed for his room next. He got dressed and anxiously was gauging the moment he could leave the motel. As he exited his room, Blackwell saw Lavington walking across the parking lot between the motel and the gas station, headed back to where Taylor was standing outside Room 221. Blackwell heard Lavington talking loudly on a cell phone, using profanity in describing the situation to someone on the other end of the call.

The search took only a couple of minutes. Straub observed a razor blade with white residue on the counter of the sink, an open box of baking soda next to the razor, and a black coat hanging on a coat rack next to the sink. In the left front pocket of the coat were 3 white rocklike substances that Straub suspected to be crack cocaine. Straub photographed the area then walked out of the room to where the others were standing.

Straub asked Taylor what the substance was. Taylor stated, "Ah, shit, that's cocaine." Straub asked who the cocaine belonged to, and Taylor said it was "all his" (according to Straub) or said "it's all mine" (according to Benyr). At that point, Taylor was arrested and handcuffed. Straub finished searching the room, then placed Taylor in rear seat of Straub's patrol car and transported Taylor to Fairmont City Police station.

When Straub and Taylor left the First Western, Benyr and Lavington remained at the motel. Lavington was not arrested. Once he reached the police station, Taylor declined a request to provide a statement to law enforcement regarding the crack cocaine seized from the coat pocket.

Indicted for possessing 28 grams or more of crack cocaine with the intent to distribute it, Anthony Taylor moves to suppress both the cocaine found in the coat pocket and the statements he made when confronted with the cocaine (identifying the substance as cocaine and admitting the cocaine was his). Taylor maintains that the search itself was illegal – supported by neither warrant nor consent – and that the statements are the fruit of the illegal search. The undersigned Judge addresses these dual arguments in turn.

→ **APPLICATION OF LEGAL PRINCIPLES**

■ <u>The Search of the Room 221 and Discovery of the Crack Cocaine</u>

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." **U.S. Const. amend. IV.** Thus, Fourth Amendment challenges to evidence present two distinct questions: "(1) whether a search or seizure actually occurred; and (2) if so, whether the search or seizure was unreasonable." *United States v. Curlin,* **638 F.3d 562, 565 (7th Cir. 2011),** *citing Carlson v. Bukovic,* **621 F.3d 610, 618 (7th Cir. 2010),** *cert. denied,* **131 S. Ct. 1609 (2011).** Here, a search occurred, and the primary question is whether that search was reasonable.

The "touchstone of the Fourth Amendment is reasonableness." *United States v. Jackson,* **598 F.3d 340, 346 (7th Cir.),** *cert. denied,* **131 S. Ct. 435 (2010),** *quoting Florida v. Jimeno,* **500 U.S. 248, 250 (1991).** The sanctity of the home (whether a house, an apartment, or a motel room) "is a central concern of the Fourth Amendment,"[5] and it is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *United States v. Etchin,* **614 F.3d 726, 733 (7th Cir. 2010),** *quoting Payton v. New York,* **445 U.S. 573, 586 (1980).** *See also Groh v. Ramirez,* **540 U.S. 551, 559 (2004).** The presumption can be rebutted, for instance, if exigent circumstances existed at the time of the search. *See, e.g., United States v. Huddleston,* **593 F.3d 596 (7th Cir. 2010)(Warrantless searches are constitutionally permissible under certain narrow exceptions.);** *United States v. Slone,* **636 F.3d 845, 848-49 (7th Cir. 2011)(Warrantless searches may be upheld only if they fall within one of few well-delineated exceptions.).**

Warrantless searches also are permissible if the police received voluntary consent to search. *United States v. Hicks,* **650 F.3d 1058, 1064 (7th Cir. 2011).** Here, no written consent was ever sought or given, but the Government asserts that the search is reasonable because it was conducted pursuant to Defendant Taylor's oral consent. "A well-recognized exception to the warrant requirement applies … when someone consents to a search." *Jackson,* **598 F.3d at 346.**

---

[5] *See also United States v. Bell,* **500 F.3d 609, 612 (7th Cir. 2007),** *quoting Hoffa v. United States,* **385 U.S. 293, 301 (1966)(The Fourth Amendment "protects the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile.").**

Whether a person voluntarily consented depends on the totality of the circumstances.  *Hicks,* **650 F.3d at 1064,** *citing Illinois v. Rodriguez,* **497 U.S. 177, 181 (1990), and** *Schneckloth v. Bustamonte,* **412 U.S. 218 (1973).**   "The Government bears the burden of proving, by a preponderance of the evidence, that a person who consents to a search does so freely and voluntarily."  *United States v. Clinton,* **591 F.3d 968, 971-72 (7th Cir.),** *cert. denied,* **131 S. Ct. 246 (2010).**   *Accord Jackson,* **598 F.3d at 346 ("The government has the burden of proving consent by a preponderance of the evidence.").**

In the case at bar, the Court concludes that Anthony Taylor initially and repeatedly denied the officers' requests to search.  All witness testimony can be squared on this point.  Byron Blackwell heard, and Brittany Lavington saw, Taylor deny several requests to search Room 221.  However, the Court credits the officers' testimony that at some point after refusing these entreaties, Anthony Taylor orally consented to a search of his room.  Blackwell likely did not hear Taylor tell the officers they could search but would find nothing in the room.  Lavington either missed Taylor giving consent during her trip to and from the gas station or, possibly, failed to be utterly forthcoming on the stand about this particular issue, out of loyalty to her boyfriend.

The undersigned Judge finds the officers' testimony credible and consistent.  They engaged in no furtive conduct on the witness stand and did not overstate or embellish their account of the events.  To the extent that their testimony directly contradicts that of the defense witnesses on the issue of Taylor's oral consent, the Court opts to believe the officers.

The Government satisfied its burden of establishing, *by a preponderance of the evidence*, that the Defendant gave a valid oral consent to search Room 221. The consent was not nullified by Benyr's statement (which finally elicited the consent) that he was going to secure the room and get a warrant if Taylor continued to refuse consent. A baseless threat that the police will obtain a search warrant *can* render consent involuntary, but if the officer's "expressed intention to obtain a warrant is genuine … and not merely a pretext to induce submission, it does not vitiate consent to search." **Hicks, 650 F.3d at 1064.**

Stated another way, if the police had probable cause for a search warrant or "a reasonable factual basis to believe there was probable cause" such that the statement about getting a warrant was not an empty threat, the statement does not vitiate the defendant's consent. **Hicks, 650 F.3d at 1064-65.** Probable cause exists when the known facts and circumstances support a reasonable belief that a search will turn up evidence of criminal activity. **United States v. Brack, 188 F.3d 748, 755 (7th Cir. 1999).** Mere suspicion is not enough to establish probable cause, but probable cause does not require an actual showing of criminal activity – a probability or substantial chance of criminal activity suffices. **Hicks, 650 F.3d at 1065.** The Court of Appeals further has explained:

> "Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances" known at the time the event occurred. *United States v. Breit,* 429 F.3d 725, 728 (7th Cir. 2005)…. "The principal components of a determination of … probable cause will be the events which occurred leading up to the … search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to … probable cause." *Ornelas* [*v. U.S.*], 517 U.S. [690] at 696 [(1996)]….

*U.S. v. Ellis,* **499 F.3d 686, 689 (7th Cir. 2007).**

In this case, there was ample probable cause to obtain a search warrant. Both officers smelled marijuana outside Room 221. The forthright testimony by Miss Lavington that she had been smoking "weed" just prior to the officers' arrival bolsters the conclusion that the officers' testimony regarding the odor of burnt cannabis was true. One of the room's occupants (Lavington) produced a green glass pipe to the officers – paraphernalia that supported their belief that a search of the room would turn up evidence of criminal activity. Officer Benyr continued to smell the marijuana odor while conversing with Taylor and Lavington just outside the door of Room 221. Moreover, when asked if there was any more marijuana in the room, Taylor stated that it already was "all smoked up," which further strengthens the conclusion probable cause existed for the officers to obtain a warrant.

This is not a case in which law enforcement made a baseless threat about getting a search warrant for the motel room. Benyr's statement that he was going to leave to get a warrant does not invalidate Taylor's oral consent. And the record before the Court contains no evidence that the consent was the product of force or intimidation. The totality of the circumstances indicates that Taylor knowingly and voluntarily consented to the search of his motel room.

The Court does not have to discredit Brittany Lavington or Byron Blackwell to reach this conclusion. With a few minor exceptions, the bulk of their testimony can be reconciled with the officers' accounts. Both Lavington and Blackwell, the Court believes, heard Anthony Taylor repeatedly refuse to consent to the search. Lavington

witnessed some of Taylor's interaction with the officers. But neither Lavington nor Blackwell heard or observed the *entire* exchange between Taylor and the cops. Lavington walked over to the gas station/convenience store to buy cigarettes, and she was seen on her telephone (involved in her own conversation and talking loudly). Blackwell, in the nearby room worrying that the officers might be headed his direction, was busy getting dressed, talking to the friend in the room with him, and planning their exit. He did not look out the window for fear of drawing attention to himself, and he candidly admitted he could have missed portions of Taylor's conversation with the police before hastily fleeing the motel.

The officers had the right to conduct a "knock and talk." That is not challenged here. After multiple attempts, they obtained Taylor's oral consent to search the room. Based on the knowing and voluntary consent by Taylor, the Court rejects Defendant's argument for suppression of the crack cocaine found in the coat pocket in Room 221.

Which leads to the statements Taylor made *after* Straub confronted him with the cocaine. Defendant moved to suppress the post-search statements as "fruit of the poisonous tree."[6] But the Court has found the search lawful, which scotches that ground for suppression. Another ground for suppression (not addressed in the parties' initial briefs) was fleshed out by the testimony adduced at the hearing – whether Taylor was in custody while his room was being searched such that the questions Officer

---

6   *See, e.g., United States v. Conrad,* 673 F.3d 728, 732 (7th Cir. 2012) ("exclusion will run not only to the unconstitutionally obtained evidence, but also to the fruits of that evidence – the so-called fruit of the poisonous tree." This is how the exclusionary rule discourages official misconduct – "by removing the incentive to obtain evidence in violation of the Constitution.").

Straub posed to Taylor without first advising him of *Miranda* rights ran afoul of the Fifth Amendment to the United States Constitution.

- ▪ <u>The Statements Made by Taylor After the Cocaine Was Found</u>

The record before the Court (Straub and Benyr's testimony as to the *key* facts of the initial encounter between Taylor and the officers) leads the undersigned Judge to conclude that the search of the room was constitutionally permissible because based on voluntary consent. However, the inquiry does not end there. The officers testified that they did not present written consent-to-search forms because they suspected at most a misdemeanor offense by Taylor, connected to the pot and the pipe. That failure to follow formalities, perhaps, is understandable. However, the Court is utterly baffled by the officers' failure, *once the cocaine was discovered by Straub* in the coat pocket, to advise Taylor of his Miranda rights *before* asking two critical questions – (1) what was in the bag? (answer: cocaine), and (2) to whom did the cocaine belong? (answer: to Taylor).

Both officers testified that at the moment when these questions were posed to Mr. Taylor, he was "detained." Officer Benyr was standing with Taylor during the search, which was estimated by Benyr to have taken just a few minutes. Although Taylor had not yet been arrested, he was "not free to leave." So was Taylor in "custody" when he was asked these questions regarding the results of Straub's search?

Under *Miranda v. Arizona*, **384 U.S. 436, 467-73 (1966),** when an individual is taken into custody *or otherwise deprived of his freedom by the authorities in any significant way*, before he is subjected to questioning, he must be informed in clear and unequivocal terms that he has the right to remain silent, that anything he says can and

will be used against him in court, that he has the right to consult with a lawyer and to have the lawyer with him during interrogation, and that if he is indigent, a lawyer will be appointed for him.  *United States v. Wysinger,* **683 F.3d 784, 797-98 (7th Cir. 2012).**

*Miranda* safeguards come into play when an individual is subjected to <u>interrogation</u> while in <u>custody</u>.  Turning to the first part of that formula, the test for determining whether a suspect was subjected to interrogation is whether an objective observer would believe that an officer's express words or actions were "reasonably likely to elicit an incriminating response." *United States v. Johnson,* **680 F.3d 966, 976 (7th Cir. 2012),** *citing United States v. Swanson,* **635 F.3d 995, 1002 (7th Cir. 2011), and** *United States v. Abdulla,* **294 F.3d 830, 834 (7th Cir. 2002).**

Anthony Taylor was subjected to <u>interrogation</u> when Officer Straub confronted him with the baggie of white substance and directly asked what this was and to whom it belonged.   The question is whether Taylor was <u>in custody</u> for *Miranda* purposes.

The Seventh Circuit addressed this requirement earlier this year:

> The admonitions set forth in *Miranda* were designed to safeguard the constitutional guarantee against self-incrimination. *J.D.B. v. North Carolina,* –– U.S. ––, 131 S.Ct. 2394, 2401 … (2011). The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right. *Id.* at 2401. Accordingly, *Miranda* held that the government may not use statements stemming from the custodial interrogation of a defendant unless the government has utilized procedural safeguards effective to secure the privilege against self-incrimination….
>
> **That does not mean that any statements obtained by the government in a conversation with a defendant are excluded unless preceded by *Miranda* warnings. *Miranda* warnings are not required merely because the person being questioned is a suspect or the focus of a criminal**

> **investigation.** *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). The privilege against self-incrimination is not imperiled by every conversation with the government. Instead, the concern in *Miranda* was with the inherently coercive nature of custodial interrogation. Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required.

*United States v. Ambrose*, **668 F.3d 943, 954 (7th Cir. 2012)(emphasis added),** *cert. denied*, **-- S. Ct. --, 2012 WL 2367764 (Oct. 1, 2012).**

Of particular relevance to the case *sub judice*, the Court in *Ambrose* explained precisely what constitutes being "in custody" for *Miranda* purposes. This requires a "formal arrest or a restraint on his … freedom of movement of the degree associated with formal arrest." *Ambrose*, **668 F.3d at 954,** *citing* **J.D.B., 131 S. Ct. at 2402, and** *United States v. Podhorn*, **549 F.3d 552, 556 (7th Cir. 2008).** Seventh Circuit case law emphasizes that the person must be deprived of freedom of action in a *significant* way, and that the inquiry is an *objective*, not subjective one.

As the Court in *Ambrose* summarized, *id.* **at 954-55:**

> Neither the subjective views of the suspect being questioned nor that of the officer engaging in the questioning is considered. Rather than focus on the idiosyncrasies of individuals that can impact how questioning is perceived, the Court has opted for an objective test that asks how a reasonable person in the suspect's position would have understood the situation…. The Court has identified two discrete inquiries critical to that determination: "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.*, 131 S.Ct. at 2402; *Podhorn*, 549 F.3d at 556. Once that is determined, courts apply the objective test to resolve the ultimate inquiry—whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Yarborough,* 541 U.S. at 663, 124 S.Ct. 2140.

*See also Johnson,* 680 F.3d at 973-74 ("A suspect is in custody for purposes of *Miranda* if, based on a totality of the circumstances, a reasonable person in the suspect's position would not have believed he was free to leave.").

So, in the case *sub judice,* the officers' own belief that Taylor was "detained" when he was standing in the hallway before being questioned about the substance discovered in his coat pocket does not mean that Taylor was in custody at that point. Careful examination of the factors surrounding the questioning sheds light on what a reasonable person would have perceived in Taylor's position.

When Straub asked Taylor the two questions about the white substance from the coat, Taylor was not handcuffed, was not in a police station or police vehicle, and was not enclosed in a small space or otherwise cramped or restrained from movement. He was standing outside, in an exterior hallway of a motel, near an exit staircase, with other motel guests coming and going past him. The time he stood at the top of the staircase (while Straub searched) was brief, lasting only a couple of minutes.

Additionally, although this is not the decisive factor and the exact temporal sequence is hard to pin down, it is notable that Taylor's girlfriend (who had given the officers the marijuana pipe and could have been arrested for that possession alone) had voluntarily exited the motel room, voluntarily engaged in conversation with the officers, and at some point in the encounter (the Court believes) left the area where Taylor was talking to the officers, walked to a gas station, went inside, bought cigarettes, and made phone calls as she ambled back to the second floor hallway outside Room 221 where Taylor stood by the staircase to the parking lot.

In *Ambrose,* the Court of Appeals affirmed the district court's denial of a suppression motion where the defendant was summoned to the FBI building on a ruse, relieved of his keys and cell phone, and interviewed by the United States Attorney and the FBI Special Agent in Charge in a spacious conference room. The Court of Appeals noted that the "physical setting of the meeting itself did not signal a restriction on the freedom to leave," because the encounter with law enforcement occurred "in a public place," easing the coercive aspects of the encounter. *Ambrose,* **668 F.3d at 956-57.** The Court contrasted this setting with the windowless Lilliputian interview room in which a suspect was interviewed with one detective blocking the door in *United States v. Slaight,* **620 F.3d 816, 819 (7th Cir. 2010).** *Id.* The *Ambrose* Court found that although the defendant being questioned in the FBI conference room was interrogated, he was not in custody, because a reasonable person would have believed himself free to leave.

Like *Ambrose* and unlike *Slaight,* Anthony Taylor's encounter occurred in a public place (in fact outside near a stairway exit to the parking lot), Taylor freely spoke with the officers, Taylor had not been told he was forbidden to leave, Taylor had not been told he was under arrest, Taylor had not been moved to another location from the scene, there is no indication that Taylor was yelled at in hostile tones or intimidated by the officers, and Taylor did not face "a threatening presence of several officers and a display of weapons or physical force." *See Ambrose,* **668 F.3d at 956.**

The Court finds that, given the circumstances surrounding Taylor's brief detention on the sidewalk outside Room 221 of the motel, a reasonable person would have felt he was at liberty to leave, and Taylor was not formally arrested (or restrained

to the degree associated with formal arrest) at the time the two questions were posed to him by Officer Straub. Taylor was not in custody when Straub questioned him.

Stated another way, the questioning of Taylor was not "custodial" interrogation triggering the *Miranda* safeguards. The record is utterly devoid of any evidence that Taylor's statements about the cocaine were involuntary or the product of coercion. Taylor's statements regarding the substance found in the coat pocket do not warrant suppression.

### C. Conclusion

For all these reasons, the Court **DENIES** Defendant's motion to suppress evidence and statements (Doc. 25).

Jury trial will commence at 9:00 am on Monday, October 29, 2012. The deadline for filing motions in limine has elapsed without any party moving to extend it. Proposed jury instructions (the marked copy of each individual instruction paper-clipped on *top* of the corresponding clean copy of that instruction) shall be submitted to the chambers of the undersigned Judge by 4:00 pm on Wednesday, October 24, 2012. Where applicable/possible, counsel shall use the Seventh Circuit Criminal Pattern Jury Instructions (2011 "Proposed" version).

IT IS SO ORDERED.

DATED October 16, 2012.

s/ ***Michael J. Reagan***
Michael J. Reagan
United States District Judge